# EXHIBIT   B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life  )
Term Parole Consideration  )        CDC Number C-87891
Hearing of:                )
                           )
JUSTINO VIVAR              )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 12, 2005

8:40 A.M.

PANEL PRESENT:

CAROL DALY, Presiding Commissioner
ROBERT HARMON, Deputy Commissioner

OTHERS PRESENT:

JUSTINO VIVAR, Inmate
MARY ANN TARDIFF, Attorney for Inmate
RICHARD SACHS, Deputy District Attorney
        Via Videoconference
JOSE ZAVALA, Interpreter
TAMMY DIAZ, Paralegal/Observer
        Via Videoconference

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum

**Tamyra Morgan**          **Capitol Electronic Reporting**

ii

INDEX

Page

Proceedings............................................. 1

Case Factors...........................................11

Pre-Commitment Factors.................................15

Post-Commitment Factors................................19

Parole Plans...........................................33

Closing Statements.....................................41

Recess.................................................45

Decision...............................................46

Adjournment............................................52

Transcriber Certification..............................53

--oOo--

1

1        **P R O C E E D I N G S**

2            **INTERPRETER ZAVALA:**  Good morning.

3            **PRESIDING COMMISSIONER DALY:**  Okay.  This is

4     an Initial (sic) Parole Consideration Hearing for

5     Justino Vivar, CDC number C-87891.  Date of the

6     hearing is May 12th of 2005, and it is 0840 hours.

7     We are located at the Correctional Training

8     Facility at Soledad.  Date received was 6/20 of

9     1984.  Life term starts 6/20/84, out of the County

10    of San Diego.  Offense is murder in the second

11    degree with use of a deadly weapon, case number

12    CR9113.  One count of 187 and 12022(b) and the

13    terms are 16 years to life with a Minimum Eligible

14    Parole Date of 11/2 of 1993.  This hearing is

15    going to be tape-recorded and so for purposes of

16    voice identification, we are going to go around

17    the room to my left.  Each person is going to

18    state their name, spell their last name, and then

19    after you have spelled your last name, Mr. Vivar,

20    give your CDC number.  Carol Daly, D-A-L-Y,

21    Commissioner, Board of Prison Terms.

22            **DEPUTY COMMISSIONER HARMON:**  Robert Harmon,

23    H-A-R-M-O-N, Deputy Commissioner.

24            **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

25    T-A-R-D-I double F, attorney for Mr. Vivar.

26            **INMATE VIVAR:**  Vivar, C-87891.

27            **PRESIDING COMMISSIONER DALY:**  And spell your

2

1    last name.

2          **INMATE VIVAR:**  J-U-S-T-I-N-O, V-I-V-A-R.

3          **PRESIDING COMMISSIONER DALY:**  Okay.

4          **INTERPRETER ZAVALA:**  Jose Zavala,

5    Z-A-V-A-L-A, Spanish Interpreter for Mr. Vivar.

6          **PRESIDING COMMISSIONER DALY:**  Okay.

7    Mr. Zavala, let me swear you in.  Do you solemnly

8    swear to translate to the best of your ability

9    from English to Spanish and Spanish to English?

10          **INTERPRETER ZAVALA:**  I do.

11          **PRESIDING COMMISSIONER DALY:**  And do you

12    have any personal interest in this case?

13          **INTERPRETER ZAVALA:**  No.

14          **PRESIDING COMMISSIONER DALY:**  And let the

15    record reflect we have two correctional peace

16    officers in the room for security purposes only.

17    Okay.  This hearing is actually going to be

18    videoconferenced with San Diego County District

19    Attorney's Officer.  We're waiting for them to

20    call in.  So the District Attorney is going to

21    appear by means of videoconference between the San

22    Diego County District Attorney's Office and

23    Soledad State Prison pursuant to Penal Code

24    Section 3043.25.  The District Attorney will

25    appear by means of videoconferencing, which means

26    that his testimony and participation in the

27    hearing will by means of live audio and video

3

1    transmission from San Diego to our hearing room

2    here at Soledad.  Now simultaneously, the District

3    Attorney in San Diego will be receiving live audio

4    and video transmission of all of the proceedings

5    here at Soledad, and the hearing will be conducted

6    as though all participants are present in the same

7    location following the same rules and procedures

8    that are followed at all such parole consideration

9    hearings.  Now this hearing is also being

10   audiotaped and the record of the hearing will be

11   the transcript of the audiotape pursuant to Penal

12   Code Section 3042(b).  All right.  Now we've

13   already identified everybody in the room here.

14   And so we are going to proceed while we're waiting

15   for the San Diego DA.  All right.  Mr. Vivar, do

16   you read English or do you speak English at all?

17        **INMATE VIVAR THROUGH INTERPRETER:**  Read and

18   speak a little.

19        **PRESIDING COMMISSIONER DALY:**  Okay.  Could

20   you read the ADA Form there in front?

21        **INMATE VIVAR:**  ADA, Americans with

22   Disabilities Act.

23        "The Americans with Disabilities Act,

24        ADA, is a law to help people with

25        disabilities.  Disabilities are

26        problems that make it harder for some

27        people to see, hear, breathe, talk,

4

1      walk, learn, think, work, or take

2      care of themselves than it is for

3      others.  Nobody can keep out of

4      public places or activities because

5      of the disability.  If you have a

6      disability, you have the right to ask

7      for help to get ready for your BPT

8      hearing, get to the hearing, talk,

9      read forms and papers, and understand

10      the hearing process.  BPT will look

11      at what you asked for to make sure

12      that you have a disability that it is

13      covered by the ADA and that you have

14      asked for the right kind of help.  If

15      you do not get the help or if you

16      don't think you got the kind of help

17      you need, ask for the BPT 1074

18      Grievance Form.  You can also get

19      help to fill it out."

20      **PRESIDING COMMISSIONER DALY:**  You did very

21      well.  Thank you, Mr. Vivar.  Now San Diego can

22      you hear us?

23      **DEPUTY DISTRICT ATTORNEY SACHS:**  Yes, we can

24      hear you well.  Can you hear us?

25      **PRESIDING COMMISSIONER DALY:**  We have just

26      done the introductions.  The Deputy Commissioner

27      is Mr. Harmon, and our attorney is Ms. Tardiff,

1   and Mr. Zavala is our interpreter.

2       **DEPUTY DISTRICT ATTORNEY SACHS:** Good

3   morning all of you.

4       **PRESIDING COMMISSIONER DALY:** So now we will

5   go to your location if you will identify who is

6   there.

7       **DEPUTY DISTRICT ATTORNEY SACHS:** I'm Richard

8   Sachs, S-A-C-H-S, Deputy District Attorney, San

9   Diego County and I have my paralegal, Tammy Diaz.

10  Which case -- What are we on again? Which one is

11  this?

12      **ATTORNEY TARDIFF:** This is Vivar.

13      **PRESIDING COMMISSIONER DALY:** Vivar.

14      **DEPUTY DISTRICT ATTORNEY SACHS:** Vivar.

15  Thank you very much.

16      **PRESIDING COMMISSIONER DALY:** Okay. And

17  then we will proceed. Mr. Vivar, do you wear

18  glasses at all?

19      **INMATE VIVAR:** No.

20      **PRESIDING COMMISSIONER DALY:** Okay. So you

21  were able to read and you didn't have your

22  glasses. Do you have any hearing impairments?

23      **INMATE VIVAR:** No.

24      **PRESIDING COMMISSIONER DALY:** Okay. And

25  have you ever been included in a Triple CMS or an

26  EOP Program since you've been in prison?

27      **INMATE VIVAR THROUGH INTERPRETER:** No.

6

1          **PRESIDING COMMISSIONER DALY:**  Okay.  You

2    know what those programs are?

3          **INMATE VIVAR THROUGH INTERPRETER:**  No, I

4    don't.

5          **PRESIDING COMMISSIONER DALY:**  Okay.  Those

6    are the mental health programs.  Have you

7    participated in those?

8          **INMATE VIVAR THROUGH INTERPRETER:**  No.

9          **PRESIDING COMMISSIONER DALY:**  Okay.  Have

10   you ever been prescribed psychotropic medication

11   in prison or on the streets?

12         **INMATE VIVAR THROUGH INTERPRETER:**  No.

13         **PRESIDING COMMISSIONER DALY:**  Okay.  And how

14   far did you get in school before coming to prison?

15         **INMATE VIVAR THROUGH INTERPRETER:**  Sixth

16   grade or primary.

17         **PRESIDING COMMISSIONER DALY:**  Okay.  When

18   you were going to school, did you have to have any

19   special tutoring in order to pass your grades?

20         **INMATE VIVAR THROUGH INTERPRETER:**  Here or

21   in Mexico?

22         **PRESIDING COMMISSIONER DALY:**  In Mexico.

23         **INMATE VIVAR THROUGH INTERPRETER:**  Just my

24   teacher.

25         **PRESIDING COMMISSIONER DALY:**  Okay.  And so

26   do you suffer from any disability that would

27   prevent you from going forward with this hearing

7

1    today?

2              **INMATE VIVAR THROUGH INTERPRETER:**  No.

3              **PRESIDING COMMISSIONER DALY:**  Okay.  Now

4    this hearing is being conducted pursuant to Penal

5    Code Sections 3041, 3042, and the rules and

6    regulations of the Board of Prison Terms governing

7    parole consideration hearings for life inmates.

8    Now the purpose of today's hearing is to once

9    again consider your suitability for parole.  In

10   doing so, we will consider the number and the

11   nature of the crimes that you were committed for,

12   your prior criminal and social history, and your

13   behavior and your programming since your

14   commitment.  Now we have had an opportunity to

15   review your Central File and your prior

16   transcripts are available, and you will be given

17   an opportunity to correct or clarify the record.

18   Now we will consider your progress since your last

19   hearing, your psychological reports, and any other

20   information that might have a bearing on your

21   suitability for parole.  Any change in parole

22   plans needs to be brought to our attention.  All

23   right.  Now we will reach a decision today and

24   inform you whether we find you suitable for parole

25   and the reasons for our decision.  And if you are

26   found suitable for parole, the length of your

27   confinement will be explained to you.  Okay.  And

8

1    before we recess for deliberations today, the

2    District Attorney, your attorney and then you will

3    be given an opportunity to make a statement

4    regarding your parole suitability.  Your statement

5    will be limited to why you feel you are suitable

6    for parole at this time.  After that we will

7    recess, clear the room, and do our deliberations.

8    And once we have completed our deliberations, we

9    will resume the hearing and announce our decision.

10   Now the California Code of Regulations state that,

11   regardless of the amount of time served, a life

12   inmate shall be found unsuitable for and denied

13   parole if in the judgment of the Panel releasing

14   the prisoner would pose an unreasonable risk of

15   danger to society.  Now you have certain rights

16   and those rights include the right to a timely

17   notice of this hearing, the right to review your

18   Central File, and the right to present relevant

19   documents.  Counsel, do you feel your client's

20   rights have been met thus far?

21           **ATTORNEY TARDIFF:**   I do.

22           **PRESIDING COMMISSIONER DALY:**  You have an

23   additional right to be heard by an impartial

24   Panel.  Looking at the Panel seated before you

25   today, do have any objection to either member of

26   this Panel?

27           **INMATE VIVAR THROUGH INTERPRETER:**  No.

9

```
 1            PRESIDING COMMISSIONER DALY:  Okay.  And,
 2    Counsel, do you have any objection?
 3            ATTORNEY TARDIFF:  No, I don't.
 4            PRESIDING COMMISSIONER DALY:  And you will
 5    receive a copy of our written tentative decision
 6    today.  That decision becomes effective within 120
 7    days.  During that time, a copy of the decision
 8    and a copy of the transcript will be sent to you.
 9    Okay.  Now as of May 1st, 2004, there are major
10    changes limiting your former right to appeal Board
11    decisions or actions directly to the Board.  The
12    old Board regulations have been repealed and the
13    current policy is entitled Administrative Appeals,
14    Correspondence, and Grievances Concerning Board of
15    Prison Term Decisions, and it is available in the
16    prison law library.  Okay.  Now you are not
17    required to admit to your offense nor are you
18    required to discuss your offense.  However, the
19    Panel does accept as true the findings of the
20    court.  Do you understand what that means?
21            INMATE VIVAR THROUGH INTERPRETER:  Yes.
22            PRESIDING COMMISSIONER DALY:  Okay.  Do we
23    have any confidential material to be used today?
24            DEPUTY COMMISSIONER HARMON:  No, we don't.
25            PRESIDING COMMISSIONER DALY:  Okay.  And I
26    passed a hearing checklist and I marked it Exhibit
27    Number One.  Counsel, do you have all those
```

10

1    documents?

2         **ATTORNEY TARDIFF:**  I do.

3         **PRESIDING COMMISSIONER DALY:**  Okay.  And,

4    District Attorney, do you have all of the

5    documents that are listed on our checklist dated

6    March 15th of '05?  Okay.  The District Attorney

7    isn't right there.  So, Counsel, do you have any

8    additional documents to be submitted?

9         **ATTORNEY TARDIFF:**  No, I do not.

10         **DEPUTY DISTRICT ATTORNEY SACHS:**  Yes,

11   Commissioner, we have all those documents and so

12   stipulate.

13         **PRESIDING COMMISSIONER DALY:**  Okay.  Thank

14   you.  Any preliminary objections, Counsel?

15         **ATTORNEY TARDIFF:**  None.

16         **PRESIDING COMMISSIONER DALY:**  And is

17   Mr. Vivar going to be speaking with us?

18         **ATTORNEY TARDIFF:**  Yes.

19         **PRESIDING COMMISSIONER DALY:**  Okay.

20   Mr. Vivar, raise your right hand so I can swear

21   you in.  Do you solemnly swear or affirm testimony

22   you give at the hearing today will be the truth,

23   the whole truth, and nothing but the truth?

24         **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

25         **PRESIDING COMMISSIONER DALY:**  Okay.

26   Counsel, I'm going to look at the Statement of

27   Facts as they're spelled briefly in the probation

11

1    officer's report on page two and this says:

2              "On December 31st, 1983, sometime

3              between two p.m. and 11 p.m., several

4              illegal aliens were celebrating the

5              oncoming New Year in an avocado grove

6              southeast of 1865 Idaho Avenue in

7              Escondido, California.  The group was

8              seated around a campfire and all had

9              consumed considerable amounts of

10             alcoholic beverages.  One witness

11             recalled the group breaking up into

12             two factions with a series of insults

13             being hurled back and forth between

14             the two groups.  Subsequently, a

15             fight broke out and between -- broke

16             out between Amadeo Morales Martinez

17             and his codefendant Gadencio Vivar,

18             and that's G-A-D-E-N-C-I-O.

19             Codefendant Vivar repeatedly stabbed

20             the victim with a machete and was

21             soon joined by the defendant who

22             proceeded to repeatedly stab the

23             victim.  One witness, while escaping

24             from the area, noted that the victim

25             was lying on the ground with his head

26             tilted back and his eyes wide open.

27             Nonetheless, both the defendant and

12

```
 1          codefendant continued to hit and hack

 2          away at the victim.  Another witness

 3          recalled that the defendant and

 4          codefendant striking out at the

 5          victim while he was only attempting

 6          to protect himself and fend off the

 7          blows.  This witness described both

 8          the codefendant and defendant as,

 9          quote, 'violent,' End quote, when

10          they were intoxicated."
```

And then the witness contacted a local rancher,

who called the police, and Mr. Martinez was

already dead when they got to the scene.

```
14          "And the subsequent autopsy revealed

15          no less than nine stab wounds to the

16          victim's chest and throat.

17          Additionally, the autopsy revealed no

18          less than 25 wounds inflicted by the

19          machete on the victim's arms, back,

20          and head.  The victim's left ear was

21          missing as a result of one of these

22          blows.  The cause of death was cited

23          as massive hemorrhage due to external

24          lacerations, introthorasic massive --

25          introthorasic lacerations, laceration

26          to carotid artery, and a stab wound

27          severing the victim's aorta.  The
```

13

1          examining pathologist also noted that

2          the victim had suffered lacerations

3          and hemorrhage to the brain due to

4          numerous blows to the head.

5          Additionally, the victim had a blood

6          alcohol level of .17 percent."

7    Okay. Mr. Vivar, listening to the facts as

8    they're spelled out in the probation officer's

9    report, is that a true reflection of what

10   happened?

11          **INMATE VIVAR THROUGH INTERPRETER:** Yes.

12          **PRESIDING COMMISSIONER DALY:** Okay. So are

13   you and your crime partner responsible for the

14   death of Mr. Martinez?

15          **INMATE VIVAR THROUGH INTERPRETER:** Yes.

16          **PRESIDING COMMISSIONER DALY:** Do you have

17   any explanation at all as to why you killed this

18   man in such a violent manner?

19          **INMATE VIVAR THROUGH INTERPRETER:** Well, he

20   came first and called us names.

21          **PRESIDING COMMISSIONER DALY:** And was that

22   reason for taking his life?

23          **INMATE VIVAR THROUGH INTERPRETER:** We were

24   drunk and we didn't think of the consequences.

25          **PRESIDING COMMISSIONER DALY:** Okay. So even

26   being drunk and the fact that somebody calls you a

27   names, is that a reason to start a fight and take

14

1    knife and stab him so many times?

2            **INMATE VIVAR THROUGH INTERPRETER:**  No.

3    That's not the case.  No, but at that time, I

4    mean, he started calling us names.

5            **PRESIDING COMMISSIONER DALY:**  Okay.  It said

6    that you stabbed him with the idea that you wanted

7    to kill him, and you stabbed him until all of the

8    fight was out of him.  Is that correct?

9            **INMATE VIVAR THROUGH INTERPRETER:**  I hit him

10   but I don't remember how many times.

11           **PRESIDING COMMISSIONER DALY:**  You don't

12   remember how many times?

13           **INMATE VIVAR THROUGH INTERPRETER:**  No.

14           **PRESIDING COMMISSIONER DALY:**  Okay.  Well,

15   listening to the autopsy report -- I meant this

16   was a very violent death that this man suffered.

17           **INMATE VIVAR THROUGH INTERPRETER:**  I know.

18           **PRESIDING COMMISSIONER DALY:**  So how long

19   did you know the victim?

20           **INMATE VIVAR THROUGH INTERPRETER:**  A long

21   time.

22           **PRESIDING COMMISSIONER DALY:**  So did you

23   know his family?

24           **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

25           **PRESIDING COMMISSIONER DALY:**  So what

26   consequences -- What impact do you think this had

27   on his family?

15

1          INMATE VIVAR THROUGH INTERPRETER:  Well,

2    they must have felt sad.

3          PRESIDING COMMISSIONER DALY:  So have you

4    ever lost somebody close to you?

5          INMATE VIVAR THROUGH INTERPRETER:  Not that

6    way, no.

7          PRESIDING COMMISSIONER DALY:  Okay.  Did he

8    have any children?

9          INMATE VIVAR THROUGH INTERPRETER:  No.

10          PRESIDING COMMISSIONER DALY:  Did he have a

11    wife?

12          INMATE VIVAR THROUGH INTERPRETER:  No.

13          PRESIDING COMMISSIONER DALY:  Okay.  And how

14    old was Mr. Martinez.

15          INMATE VIVAR THROUGH INTERPRETER:  Around

16    26.

17          PRESIDING COMMISSIONER DALY:  Okay.  So he

18    was just a young man that had his whole life in

19    front of him yet.

20          INMATE VIVAR THROUGH INTERPRETER:  Yes.

21          PRESIDING COMMISSIONER DALY:  Is there

22    anything else that you want to say about this

23    crime?

24          INMATE VIVAR THROUGH INTERPRETER:  No.

25          PRESIDING COMMISSIONER DALY:  Okay.  And

26    looking at your criminal history, you had never

27    been arrested as a juvenile.

16

1          INMATE VIVAR THROUGH INTERPRETER:  No.

2          PRESIDING COMMISSIONER DALY:  So when you

3    were living in Mexico as a youngster?

4          INMATE VIVAR THROUGH INTERPRETER:  Yes.

5          PRESIDING COMMISSIONER DALY:  And you never

6    got into trouble with the police there?

7          INMATE VIVAR THROUGH INTERPRETER:  No.

8          PRESIDING COMMISSIONER DALY:  And you were

9    arrested for receiving stolen property as an

10   adult.  What was that about?

11         INMATE VIVAR THROUGH INTERPRETER:  A

12   bicycle.

13         PRESIDING COMMISSIONER DALY:  All right.

14   And how old were you when you stole the bicycle?

15         INMATE VIVAR THROUGH INTERPRETER:  Twenty-

16   three, 24.

17         PRESIDING COMMISSIONER DALY:  Okay.  And

18   what, somebody stole it and then you took it or

19   what?

20         INMATE VIVAR THROUGH INTERPRETER:  It was

21   sold to me.  I didn't know it was stolen.

22         PRESIDING COMMISSIONER DALY:  Okay.  How old

23   are you right now?

24         INMATE VIVAR THROUGH INTERPRETER:  Forty-

25   seven.

26         PRESIDING COMMISSIONER DALY:  Okay.  And you

27   were born and raised in Mexico, and you came from

17

1    a large family, nine children.  And we talked

2    about you going to the sixth grade in Mexico.  And

3    that was normal for people living in Mexico,

4    right?

5         **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

6         **PRESIDING COMMISSIONER DALY:**  To drop out of

7    school after the sixth grade?

8         **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

9         **PRESIDING COMMISSIONER DALY:**  You came into

10   the United States illegally in 1976.

11        **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

12        **PRESIDING COMMISSIONER DALY:**  And then you

13   remained until 1979, and then you came in again

14   illegally in 1980.

15        **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

16        **PRESIDING COMMISSIONER DALY:**  And lived in

17   the Escondido area.

18        **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

19        **PRESIDING COMMISSIONER DALY:**  So why did you

20   leave and then come back?  Were you deported?

21        **INMATE VIVAR THROUGH INTERPRETER:**  No.  I

22   just wanted to go see my family.

23        **PRESIDING COMMISSIONER DALY:**  Okay.  It says

24   that you have no known history -- Have you ever

25   used drugs?

26        **INMATE VIVAR THROUGH INTERPRETER:**  No.

27        **PRESIDING COMMISSIONER DALY:**  And it says in

18

1    here you were a social drinker, but you were a

2    heavy drinker.

3             **INMATE VIVAR THROUGH INTERPRETER:** I would

4    drink but I would also work.

5             **PRESIDING COMMISSIONER DALY:** Okay. So how

6    often would you drink?

7             **INMATE VIVAR THROUGH INTERPRETER:** Every

8    weekend.

9             **PRESIDING COMMISSIONER DALY:** Okay. Would

10   you get drunk every weekend then?

11            **INMATE VIVAR THROUGH INTERPRETER:** Not a

12   whole lot but I would drink.

13            **PRESIDING COMMISSIONER DALY:** Okay. Do you

14   consider yourself an alcoholic?

15            **INMATE VIVAR THROUGH INTERPRETER:** Yes.

16            **PRESIDING COMMISSIONER DALY:** Okay. And you

17   were under the influence of alcohol when you did

18   this crime.

19            **INMATE VIVAR THROUGH INTERPRETER:** Yes.

20            **PRESIDING COMMISSIONER DALY:** What's your

21   current social support from the outside?

22            **INMATE VIVAR THROUGH INTERPRETER:** My

23   sisters and my brother support me holding a

24   business either here or in Mexico, but I think

25   it's going to be in Mexico because I have a

26   deportation set for Mexico.

27            **PRESIDING COMMISSIONER DALY:** Okay. So you

19

1    write, and do you get visits?

2          **INMATE VIVAR THROUGH INTERPRETER:**  My

3    brother-in-law visits me.

4          **PRESIDING COMMISSIONER DALY:**  Okay.  And do

5    you make phone calls to your family?

6          **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

7          **PRESIDING COMMISSIONER DALY:**  Okay.  Is

8    there anything else you want to say about your

9    social history?

10         **INMATE VIVAR THROUGH INTERPRETER:**  No.

11         **PRESIDING COMMISSIONER DALY:**  Okay.  Let's

12   go to post conviction.

13         **DEPUTY COMMISSIONER HARMON:**  Good morning,

14   Mr. Vivar?

15         **INMATE VIVAR:**  Vivar.

16         **DEPUTY COMMISSIONER HARMON:**  Vivar, okay.

17   Listen very carefully.  If the information I'm

18   providing is inaccurate, then we need to correct

19   it for the record and at least let me know.  At

20   your last hearing, which was September 16th, 2003,

21   you received a one-year denial at the time and

22   that was a stipulation.  Your actual last

23   appearance before the Board of Prison Terms was

24   June 24th, 1999, and at that time you received a

25   two-year denial.  Everything since that time has

26   been a stipulation to one year.

27         **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

20

1           **DEPUTY COMMISSIONER HARMON:**  You were

2    received at CTF February 25th, 1993, from RJ

3    Donovan.  Your current custody level is Medium A

4    with a revised class score of 19.

5           **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

6           **DEPUTY COMMISSIONER HARMON:**  I'm going to go

7    back to the period since your last hearing.  It's

8    been a lot of years since your last hearing.  I'm

9    going to briefly cover those areas as written by

10   your counselors.  I'm only going to take parts of

11   that information.

12          **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

13          **DEPUTY COMMISSIONER HARMON:**  The counselor

14   at the time from June of '99 to June of 2000 says

15   that you were at CTF Two in the general

16   population.  You were Medium A custody.  At the

17   time, you were continuing in Adult Basic Education

18   Three.

19          **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

20          **DEPUTY COMMISSIONER HARMON:**  And it says

21   that you were participating in AA.  There's no

22   psychiatric treatment and you remained

23   disciplinary-free.  Then from June of 2000 over

24   the next period, about a year, everything remains

25   the same.  You continue with Adult Basic Education

26   Three.  You continue with AA.  There's no

27   disciplinary problems and no psychiatric

21

```
 1    treatment.  And then we go to -- That brings it to
 2    around February of '01, and then from March of
 3    '01, you remain at CTF Two in the general
 4    population, Medium A custody.  You continue with
 5    your Adult Basic Education Program, receiving
 6    satisfactory ratings.  You were assigned to the
 7    vocational upholstery on September 18$^{th}$ of 2001.
 8    You continued your participation in AA based on
 9    various chronos.  There was no psychiatric
10    treatment and you remained disciplinary-free.
11    From November 15$^{th}$ of '01 to August 13$^{th}$ of '02, you
12    remained at CTF, Medium A custody.  You remained
13    assigned to the vocational upholstery program with
14    satisfactory work performance ratings, getting
15    good letter grades.  You remained in AA.  No
16    psychiatric treatment and you remained
17    disciplinary-free.  From August 14$^{th}$ of 2002 until
18    June 5$^{th}$ of '03, everything remains the same.  You
19    continue with the vocational upholstery program,
20    receiving letter grades of B's and A's.  You stay
21    with the AA Program.  And there's no negative
22    discipline and no psychiatric treatment during any
23    of this period.  And then from June of '03 until
24    July of '04, you remain assigned to the vocational
25    upholstery work program, receiving A letter grades
26    and satisfactory ratings.  And then it says in
27    March of 2004, you were reassigned Adult Basic
```

22

1   Education Two.  There was no group activities, no

2   psychiatric treatment, and no negative discipline.

3   And then today, we received an update and it

4   brings us from August of 2004 until March of '05.

5   And it says that you remain at CTF North Facility

6   and the transfer was due to a conversion at CTF

7   North.  You remain Medium A custody.  You

8   completed the vocational upholstery program and

9   you were unassigned on December 17th of '03.

10          INMATE VIVAR THROUGH INTERPRETER:  Yes.

11          DEPUTY COMMISSIONER HARMON:  It says that

12   you remain assigned to the Adult Basic Education

13   Two Program through February 17th of '05.  You

14   continued with active participation in AA.  There

15   was no psychiatric treatment and there was no

16   negative discipline.  So that brings up to March

17   of '05 and here we are into May.  Can you tell us

18   what your current assignment is?

19          INMATE VIVAR THROUGH INTERPRETER:  I don't

20   have one right now because I moved from North to

21   Central, and I haven't been called for

22   classification.

23          DEPUTY COMMISSIONER HARMON:  Okay.  And what

24   have you been doing the last couple of months in

25   terms of activities while you were unassigned?

26          INMATE VIVAR THROUGH INTERPRETER:  Reading,

27   doing hobbies.

23

1            **DEPUTY COMMISSIONER HARMON:**   Okay.   What do

2    you read?   What are you reading?

3            **INMATE VIVAR THROUGH INTERPRETER:**   School,

4    textbooks.

5            **DEPUTY COMMISSIONER HARMON:**   Okay.   Are you

6    finding -- Do you involve yourself in any type of

7    recreation?

8            **INMATE VIVAR THROUGH INTERPRETER:**   At the

9    yard, sports.

10           **DEPUTY COMMISSIONER HARMON:**   Okay.   And do

11   you go to church or?

12           **INMATE VIVAR THROUGH INTERPRETER:**   Yes.

13           **DEPUTY COMMISSIONER HARMON:**   How often.

14           **INMATE VIVAR THROUGH INTERPRETER:**   On

15   Sundays.

16           **DEPUTY COMMISSIONER HARMON:**   I see.   Okay.

17   I went over your files, and what I found out is

18   that back in 1998 you completed the vocational

19   paint and decoration program.   And then, of

20   course, in 2003 the vocational upholstery program

21   and, of course, your instructors write you as a

22   very good student.   You're very diligent.   Besides

23   your vocational programs, you've been involved in

24   the Adult Basic Education One, Two, Three Programs

25   over the years.   You've been a porter back in the

26   '80s handling various assignments.   You completed

27   English as a Second Language years ago and they

24

1    wrote you as being very bilingual.  They said you

2    were a very excellent English speaker.  Your TABE

3    scores have kind of -- Initially they went up over

4    the years and back in February of 1999, you had an

5    overall of 12.9 and a reading score of 10.2.  And

6    then in October of '02 when you took your most

7    recent TABE Test, your overall scoring went down

8    to 4.2 with a reading level of 2.9.  What

9    happened?

10          **INMATE VIVAR THROUGH INTERPRETER:**  Well,

11    they don't give us time to do the tests and I'm a

12    slow learner.

13          **DEPUTY COMMISSIONER HARMON:**  Did you have

14    somebody else take the test for you in '99?  All

15    of your scoring was very high in a very short

16    period of time.

17          **INMATE VIVAR THROUGH INTERPRETER:**  No.  The

18    teacher was there with us.  First we did it and

19    then he gave us another opportunity by allowing

20    time.

21          **DEPUTY COMMISSIONER HARMON:**  But that's a

22    big drop from -- The maximum score if 12.9 and you

23    scored that and then you drop all the way down to

24    a 4.2.  Okay.  Self-help group programs, you did

25    the Amer-I-Can Program back in '92.  You did the

26    Alternatives to Violence, the basic program back

27    in '90.  That was 26 hours.  And then you had been

25

1    involved in the Spanish AA for years.  Do you know

2    the Twelve Steps?

3         INMATE VIVAR THROUGH INTERPRETER:  Yes, in

4    Spanish.

5         DEPUTY COMMISSIONER HARMON:  And what have

6    you done in the area of the Eighth and Ninth

7    Steps?

8         INMATE VIVAR THROUGH INTERPRETER:  Writing

9    them.  I have them in writing explaining it and

10   everything.

11        DEPUTY COMMISSIONER HARMON:  Well, what has

12   he done though in the area of Ninth?  Himself,

13   what has he done?

14        INMATE VIVAR THROUGH INTERPRETER:  The one

15   of making amends.  The Steps are connected and

16   what they mean in my life.

17        DEPUTY COMMISSIONER HARMON:  Okay.  How has

18   he, other than writing them down there, has he --

19   Has he done anything else?

20        INMATE VIVAR THROUGH INTERPRETER:  Well, I

21   read them.

22        ATTORNEY TARDIFF:  He asked you specifically

23   about the Eighth and Ninth Step.

24        INMATE VIVAR THROUGH INTERPRETER:  The

25   Eighth is to make a list about (indiscernible).  I

26   wrote it down.

27        DEPUTY COMMISSIONER HARMON:  And what about

26

1    -- What about the Fourth Step?  What has he done?

2         **INMATE VIVAR THROUGH INTERPRETER:**  I think

3    basically they're the same, the Fourth and the

4    Eighth.

5         **DEPUTY COMMISSIONER HARMON:**  Do you remember

6    the Fourth Step?

7         **INMATE VIVAR THROUGH INTERPRETER:**  Yes.  To

8    make a personal inventory, moral.

9         **DEPUTY COMMISSIONER HARMON:**  Has he done

10   that?

11        **INMATE VIVAR THROUGH INTERPRETER:**  I do it

12   and I practice it.

13        **ATTORNEY TARDIFF:**  He wants to know

14   specifically what you've done in relationship to

15   the Steps.

16        **INMATE VIVAR THROUGH INTERPRETER:**  Well, I

17   accept it because if you don't accept it then

18   nothing can be worked out.

19        **DEPUTY COMMISSIONER HARMON:**  Okay.  Is there

20   any other self-help group programs you've

21   participated in since coming into the prison?

22        **INMATE VIVAR THROUGH INTERPRETER:**  No.  I

23   was in NA in San Diego.

24        **DEPUTY COMMISSIONER HARMON:**  Okay.  Your

25   reading levels at one point were 10.2 and now

26   they're at 2.9.  Have you done any self-help in

27   the area of reading at any point in your stay?

27

1      **INMATE VIVAR THROUGH INTERPRETER:**  No, just

2  that school.

3      **DEPUTY COMMISSIONER HARMON:**  Okay.  I didn't

4  find any recent laudatories.  I didn't find any

5  115s and there's ever only been one 128, December

6  31st, 1987.  That's Christmas Eve, seems to be a

7  bad day for you, doesn't it?

8      **INMATE VIVAR THROUGH INTERPRETER:**  Yes.

9      **DEPUTY COMMISSIONER HARMON:**  What did I say?

10     **PRESIDING COMMISSIONER DALY:**  Christmas.

11     **DEPUTY COMMISSIONER HARMON:**  Did I?  New

12  Year's Eve, I'm sorry.  Anyway, that's the only

13  one 128 you've ever had and I want to commend you

14  for staying disciplinary-free all these years.

15  How have you been able to stay disciplinary-free?

16     **INMATE VIVAR THROUGH INTERPRETER:**  Well,

17  keeping away from the problems.

18     **DEPUTY COMMISSIONER HARMON:**  Does he have

19  any secrets he wants to share with us?

20     **INMATE VIVAR THROUGH INTERPRETER:**  Well,

21  Jesus Christ is the secret.

22     **DEPUTY COMMISSIONER HARMON:**  Okay.  I also

23  want to point out a couple of good things here,

24  certificate of excellence in Adult Basic Education

25  back in '93.  You received a certificate of

26  appreciation from the hobby department in 1999 and

27  another letter from the Women's Crisis Center in

28

1  '98 for creating gifts for children.  What kind of

2  gifts did you create for children?

3        INMATE VIVAR THROUGH INTERPRETER:  Small

4  little purses, belts, bracelets.

5        ATTORNEY TARDIFF:  He's a leatherworker.

6        DEPUTY COMMISSIONER HARMON:  Yeah.  I'm

7  aware of that.  Thank you, Counsel.  Okay.  Any

8  other accomplishments that you've done that we

9  need to know about at this point?

10        INMATE VIVAR THROUGH INTERPRETER:  No,

11  that's it.

12        DEPUTY COMMISSIONER HARMON:  Okay.  Do you

13  believe, sir, that you pose a risk to the people

14  outside of the prison walls today?

15        INMATE VIVAR THROUGH INTERPRETER:  Well, I

16  couldn't tell you.  I'm not outside.  I think my

17  record speaks for itself.

18        DEPUTY COMMISSIONER HARMON:  Let me ask you

19  this.  What makes you a different man today than

20  the man that came into prison for the crime?

21        INMATE VIVAR THROUGH INTERPRETER:  Before I

22  was ignorant when it came to life.  I wasn't aware

23  -- I wasn't aware what it means to live a life

24  away from alcoholism and trouble-free.

25        DEPUTY COMMISSIONER HARMON:  Okay.  We have

26  a new doctor's report.  I'm going to cover parts

27  of that and that's Doctor Stack, S-T-A-C-K.  It's

29

1    from November of '04.  I'm only going to cover

2    parts of it so you can add to it when I'm done.

3    The first part here indicates that there was an

4    interpreter used back on November 1st of 2004, on

5    the day of the interview.  It says under current

6    assessment here, Current Mental Status and

7    Treatment Needs, It says on the day of the

8    interview, it says that:

9            "He was coherent, cooperative, calm,

10           and alert throughout the interview.

11           His speech was clear and readily

12           understandable.  His flow of thought

13           and affect were within the normal

14           range.  He was fully oriented.  His

15           intellectual functioning was

16           estimated to be within the average

17           range.  His attention and

18           concentration were adequate for the

19           purposes of the interview.  There was

20           no evidence of a mood or a thought

21           disorder.  His insight and judgment

22           appear to be intact.  He showed

23           increasing insight into his

24           commitment offense."

25   Under Current Mental Status and Treatment Needs:

26           "Should this inmate be given a parole

27           or release date, his prognosis for

30

1    maintaining his present gains in the

2    community is expected to continue."

3  Under Current Diagnostic Impressions:

4    "Under AXIS I:  Alcohol Abuse in

5    sustained institutional remission.

6    AXIS II:  No contributory personality

7    disorder.  AXIS III:  No contributory

8    physical disorder.  AXIS IV:

9    Incarceration.  And AXIS V:  A GAF of

10   85."

11  In the area of the Review of the Life Crime:

12   "When asked to explain his

13   understanding of the dynamics that

14   influenced him in regard to the life

15   offense, he indicated that he was

16   responsible for the crime and

17   accepted full responsibility.  In the

18   present evaluation, he clearly

19   accepted responsibility, expressed

20   remorse for his crime, and indicated

21   a deepening level of insight into the

22   life offense."

23  Assessment of Dangerousness:

24   "That Inmate Vivar would pose a less

25   than average risk for violence when

26   compared to the Level Two inmate

27   population.  And if released to the

31

1          community, his violence potential is

2          estimated to be no more than the

3          average citizen in the community.

4          Clearly, the most significant risk

5          factor for this individual would be a

6          return to the abuse of alcohol.

7          Should he begin drinking again, his

8          violence potential would be higher."

9     Clinical Observations, Comments, and

10    Recommendations, Inmate Vivar does not have a

11    mental disorder that would necessitate treatment

12    either during his incarceration or following

13    parole.  That's from Doctor Stack.  The report

14    prior to that was from October of 2002 and that

15    was from William Gamard, G-A-M-A-R-D, Staff

16    Psychologist.  That particular report, the doctor

17    in the area of clinical assessment in Current

18    Mental Status and Treatment Needs said, he showed

19    fair insight into his commitment offense.  Under

20    Diagnostic Impressions under AXIS I:  Alcohol

21    Abuse in institutional remission.  AXIS II:  No

22    contributory personality disorder.  And AXIS V:

23    There was a GAF at the time of 80.  And under

24    Assessment of Dangerousness:

25          "Violence potential within the prison

26          setting is less than average for the

27          Level Two inmate population.  And if

32

```
 1           released to the community, violence
 2           potential is estimated to be slightly
 3           higher than the average citizen in
 4           the community."
 5   And the doctor also felt that there was no mental
 6   health disorder, which needed treatment.  Okay.
 7   And I should also preface that the doctor at the
 8   time felt that his deficit insight regarding his
 9   choice of actions, which he continues to blame
10   simplistically on drinking too much.  The doctor
11   had also pointed that out, Doctor Gamard.  What
12   I've done there, Mr. Vivar, is I've taken only
13   parts of your two most recent doctor's reports.
14   I've taken parts of your counselor's reports.
15   I've taken parts of your institutional adjustment.
16   I may have left out areas that are very important
17   to you.  I'm going to return to the Chair here to
18   talk about your parole plans.  Before I do, did
19   you want to add anything in any of those areas
20   that I discussed?
21           INMATE VIVAR THROUGH INTERPRETER:  No.
22           DEPUTY COMMISSIONER HARMON:  Did we cover
23   everything okay?
24           INMATE VIVAR THROUGH INTERPRETER:  Yes.
25           DEPUTY COMMISSIONER HARMON:  Okay.  I'll
26   return to the Chair.  Thank you.
27           PRESIDING COMMISSIONER DALY:  Okay.
```

33

1    Mr. Vivar, where are you going to live?

2            **INMATE VIVAR THROUGH INTERPRETER:** In Mexico

3    with my father and my siblings.

4            **PRESIDING COMMISSIONER DALY:** Okay. And

5    that's with your sister, Rosalva (phonetic) Vivar

6    and Kelly Villa, Kelly Vila?

7            **INMATE VIVAR THROUGH INTERPRETER:** She

8    passed away.

9            **PRESIDING COMMISSIONER DALY:** And do you

10   have any employment plans yet?

11           **INMATE VIVAR THROUGH INTERPRETER:** Yes.

12           **ATTORNEY TARDIFF:** There's some letters and

13   also some in Spanish.

14           **PRESIDING COMMISSIONER DALY:** Okay. Let me

15   read the letters that we have here because I don't

16   think there were any included in the Board report.

17   It says:

18           "I would introduce myself to you. My

19           name is Justino Cisneros and I live

20           in Santa Maria, California, and my

21           brother-in-law is in custody. And I

22           am willing and capable to help him

23           any way I can. I will lend him my

24           home in Chalapa De Diaz (phonetic) in

25           Mexico. It is empty and ready for

26           him to use as needed. And I will

27           help him start up a small business to

34

```
 1              make a living and make means for food
 2              and necessities.  I am grateful I
 3              hold a very good job that I've
 4              maintained over 15 years.  And due to
 5              that, I am more capable to lend a
 6              helping hand.  He is a good man and
 7              capable of going forward and being
 8              successful."
 9       Okay.  And this is Norma Ferria (phonetic).
10              INMATE VIVAR:  My niece.
11              PRESIDING COMMISSIONER DALY:  This is an
12       offer and compromise letter extended to my uncle
13       to open a small upholstery business in Chalapa.
14              INMATE VIVAR:  Chalapa.
15              PRESIDING COMMISSIONER DALY:  De Diaz,
16       Mexico, as soon as he will find free of prison.  I
17       would be offering money to start the small
18       business and offer to cover his needs that he
19       might have at the beginning of this new life.
20       And she is hoping this will process your freedom.
21       Okay.  And then you have your parole plans that
22       you plan to live with your family, which are the
23       homes that my sisters and brother-in-law own and
24       are currently living at.  And if I were to be
25       deported, you would be in Mexico.  And your plans
26       -- let's see.  You have plans to be with your
27       sister and brother-in-laws in Santa Maria.  And
```

1  then if you would go to Mexico you have plans

2  there.  My employment plans for both the US and/or

3  if I am deported to Mexico will included the

4  search for work in the following trades,

5  upholstery, decoration, craftsman, landscaping,

6  paint, leather.  And you have 30 years of

7  experience of working on a farm.  And I have

8  experience in commercial agriculture and I've been

9  a farmhand, planted, maintained, and harvested

10  various types of crops.  So you have a number of

11  skills.  You just don't have anything concrete

12  exactly what you're going to do, right.  You have

13  some other letters that need to be read?

14        **ATTORNEY TARDIFF:**  Yes.

15        **PRESIDING COMMISSIONER DALY:**  Okay.

16        **INTERPRETER ZAVALA:**  The first one is dated

17  January 14th of 2005, Chalapa De Diaz, Oaxaca,

18  Mexico.

19        "Sirs, Representative of the

20        Government of the State of

21        California, I hereby address myself

22        to you to let you know that I am

23        willing to help my relative, Justino

24        Vivar, giving him or providing him

25        with work in my carpentry shop.  I

26        make furniture and I am aware that my

27        relative -- "

1      **DEPUTY COMMISSIONER HARMON:**  Excuse me.

2      **[Thereupon, the tape was turned over.]**

3      **DEPUTY COMMISSIONER HARMON:**  Go ahead.

4      **INTERPRETER ZAVALA:**  " -- and I'm

5      aware that my relative learned how to

6      paint furniture and he is also

7      learning the upholstery trade.

8      Therefore, it would be a pleasure to

9      help my relative in my business.  I

10     ask that you take this letter into

11     account and that you support my

12     relative, Justino Vivar.  And I thank

13     you in advance for your consideration

14     to my letter.  Sincerely, Juan Ortiz

15     Reyes."

16   Second letter is dated September 1st, 2004.

17     "Sirs of the Board of Prison Terms,

18     my name is Uvaldo Vivar R., brother

19     of Justino Vivar R., and I hereby

20     would like to tell you that my family

21     and I would like to help my brother,

22     Justino, financially and with a

23     business on the day he is granted his

24     freedom.  I also have a home and land

25     available so that my brother can

26     start his life all over in the State

27     of Oaxaca where we are from.  Please

37

1           take my letter into account and if

2           you want to contact me, I live in the

3           City of Escondido, California.  My

4           telephone number is 760-735-9291.

5           Thank you for considering my letter.

6           Sincerely, Uvaldo Vivar R."

7   This third letter is dated March 5th, 2005.

8           "Sirs, members of the Penal

9           Institution in the State of

10          California, my name is Juan Sanchez

11          Reyes, Justino Vivar Reyes' cousin,

12          and I send you this letter to let you

13          know that I am willing to provide my

14          cousin support, providing him a job

15          in my business of distributing fruit

16          to the different states of Mexico.

17          It would be a pleasure to have my

18          cousin help me out in my business.

19          Even though we do not earn dollars,

20          we do live honestly.  Therefore, I

21          ask that you take into account my

22          support for my cousin.  Respectfully,

23          Juan Sanchez Reyes."

24  And that's it.

25          **PRESIDING COMMISSIONER DALY:**  Okay.  Is

26  there anything else about your parole plans that

27  we've missed?

38

1          **INMATE VIVAR THROUGH INTERPRETER:**  No, these

2    are all the support and jobs that I know how to do

3    that my family supports me with.

4          **PRESIDING COMMISSIONER DALY:**  Okay.  So what

5    are you going to do about substance abuse

6    treatment?

7          **INMATE VIVAR THROUGH INTERPRETER:**  Continue

8    in the Alcoholics Program.  I almost forgot.  I

9    was sent a letter from the Alcoholics Anonymous.

10          **INTERPRETER ZAVALA:**  May I read it?

11          **PRESIDING COMMISSIONER DALY:**  Uh-hmm. .

12          **INTERPRETER ZAVALA:**  Alcoholics Anonymous,

13    Morello (phonetic) Street Number 154, Tamazulapan,

14    Oaxaca, 69539, dated 9/28/04.

15          "Mr. Justino Vivar, I hereby

16          introduce myself to you.  My name is

17          Rosa Guzman, Coordinator of the

18          Alcoholics Anonymous in the City of

19          Tamazulapan De Leon, half hour away

20          from the town of Chalapa De Diaz.  I

21          would like to let you know that my

22          main objective, as a result of

23          recovering from alcoholism, is to try

24          to take the alcohol message to other

25          alcoholics.  Therefore, we are

26          completely at your disposal to help

27          you and to encourage you that you --

39

1          so that you may recover from alcohol.

2          Our services are Saturdays from five

3          p.m. to seven p.m., Sundays from

4          seven p.m. to nine p.m., and Monday

5          through Friday eight p.m. to nine

6          p.m.  Therefore, you are welcome to

7          our group la Nuevo Luz, which is the

8          New Light.  And I am sending you this

9          letter through your brother-in-law,

10         Augustine Ferria.  Sincerely, Rosa,

11         Guzman, Coordinator of the group."

12         **PRESIDING COMMISSIONER DALY:**  Okay.  Very

13   good.  All right.  We do send out 3042 Notices and

14   those are notices that go out to law enforcement,

15   District Attorney, courts, victim's next of kin.

16   And as a result, we have a letter from the San

17   Diego District Attorney's Office, but we also have

18   a representative here from San Diego DA's Office

19   and he will speak at the appropriate time, so I

20   will not read the letter.  Now is the opportunity

21   for Panel members to ask questions.  Mr. Vivar, we

22   talked about what a horrifically brutal crime this

23   was, but it didn't stop there.  As soon as you got

24   through killing Mr. Martinez, your brother chased

25   after a second victim, and you followed after him

26   an watched as he killed him with a machete.  Is

27   that correct?

40

1    **INMATE VIVAR THROUGH INTERPRETER:**  I didn't

2    see when he killed the second victim.  Another

3    buddy told me.

4    **PRESIDING COMMISSIONER DALY:**  Okay.  Because

5    in the probation officer's report, it said that

6    your brother began chasing the second victim.  He

7    followed and watched him as he struck the victim

8    in the head with the machete many times.

9    **INMATE VIVAR THROUGH INTERPRETER:**  Just

10   Amadeo, not the other one.

11   **PRESIDING COMMISSIONER DALY:**  Okay.  Do you

12   have any questions, Mr. Harmon?

13   **DEPUTY COMMISSIONER HARMON:**  Just briefly.

14   The record also reflects that you and -- that you

15   had a reputation of violence among farm workers.

16   Why do you think you had that reputation?

17   **INMATE VIVAR THROUGH INTERPRETER:**  I don't

18   know.  I don't know why they said that.  I would

19   never fight with any of them, with any of their

20   witnesses.  Maybe because I drank.  I mean, I

21   don't know.

22   **DEPUTY COMMISSIONER HARMON:**  Did you ever

23   hurt other people?

24   **INMATE VIVAR THROUGH INTERPRETER:**  No.

25   **DEPUTY COMMISSIONER HARMON:**  I have nothing

26   further.

27   **PRESIDING COMMISSIONER DALY:**  District

1    Attorney, do you have any questions?

2         **DEPUTY DISTRICT ATTORNEY SACHS:**  I don't

3    have any questions, just an argument.  Thank you.

4         **PRESIDING COMMISSIONER DALY:**  Okay.

5    Counsel?

6         **ATTORNEY TARDIFF:**  No questions.

7         **PRESIDING COMMISSIONER DALY:**  Then go to

8    closing, District Attorney.

9         **DEPUTY DISTRICT ATTORNEY SACHS:**  Yes.  On

10    behalf of The People of the State of California,

11    we would respectfully oppose parole because we

12    feel that the release of Mr. Vivar would pose a

13    real risk of danger to society.  The most telling

14    factors in this case are the commitment offense

15    itself in which the prisoner exercised a callous

16    disregard for the lives of other people, for

17    killing the victim in this case for a very trivial

18    reason.  There really wasn't much of a reason

19    other than bad blood between the two at which he

20    and his brother viciously murdered and engaged in

21    murder in this case.  There has been insufficient

22    time that has passed in prison to make the

23    circumstances any different in an uncontrolled

24    environment so that the Board cannot reasonably

25    say that he would act any different were he to be

26    released and not have the support of the prison

27    institutional setting in which he has been housed.

42

1    We feel he represents a danger if he is to be

2    released due to the totality of the circumstances

3    of this case and especially due to the heinous and

4    atrocious nature of the commitment offense.  On

5    that basis, we would ask for another denial in

6    this case.  And for the protection of the

7    community, we would ask that the Board put off

8    parole for public safety reasons.

9            **PRESIDING COMMISSIONER DALY:**  Counsel,

10   closing.

11           **ATTORNEY TARDIFF:**  Thank you.  In terms of

12   Mr. Vivar's pre-incarceration history, it appears

13   as if it was very stable, obviously, other than

14   the commitment offense.  He had no prior criminal

15   history other than the insignificant theft, which

16   apparently I guess he bought stolen goods or

17   something.  He was a skilled leatherworker for

18   many years and had his own shop, so he was able to

19   maintain steady employment.  And from all

20   indications, he came from a stable intact, close

21   family.  The commitment offense in the probation

22   officer's report lists five mitigating factors.

23   The first one is that he admitted his culpability

24   early on in the proceedings or at -- actually I

25   guess at the time he was arrested, no criminal

26   history to speak of, alcohol may have been -- may

27   significantly have reduced his culpability, the

1    crime itself does not demonstrate criminal

2    sophistication, and he expressed some marginal

3    remorse at that time.  I know there's been some

4    discussion about whether or not he had a

5    reputation of being a violent individual at the

6    time and before the commitment offense.  I don't

7    think that there's sufficient evidence to support

8    that statement and should not be used at today's

9    hearing.  He's done remarkably well since he's

10   been incarcerated.  Of course, he's got his

11   vocations and his prior leatherwork, and

12   apparently he's quite good at it, actually

13   probably at an artist's level, so I don't think

14   that there's any issues there.  No 115s at all.

15   He's tried to upgrade educationally and I believe

16   he's in the GED Pre-Course at this point and he

17   did complete English as a Second Language.

18   Further, since he will deported to Mexico, I don't

19   believe that a GED is necessary for a finding of

20   suitability.  He's participated in AA since 1988

21   and he does attend church once a week.  His psych

22   evals for the most part, as well as his Board

23   reports have been supportive of release.  The '04,

24   which has been mostly read into the record, his

25   violence potential is the same as the average

26   citizen.  In '02, it was slightly higher, but then

27   in '99, he received a psych eval less than the

44

1    average citizen. In the '99 psych eval, he had
2    sound judgment. His prognosis was positive and is
3    genuinely remorseful and appropriate remorse was
4    expressed. His Board reports have been supportive
5    of release, '04 he was a low degree of threat, '02
6    minimal degree, and '01 low to moderate. So
7    overall, his evaluations are supportive of
8    release. I think he has excellent parole plans.
9    They're dual in nature for both the United States
10   and Mexico, and also I think he's done a lot of
11   work on the AA issue and where meetings would be
12   held down in Mexico. And I think that that takes
13   a lot of work particularly when you have to find
14   those plans in another country. I think the
15   issues that I see are his level of insight,
16   perhaps needing to have more self-help. I would
17   submit that I don't believe further incarceration
18   is going increase his insight. I think that he's
19   reached the level of insight, the highest level
20   that he'll obtain. You know he comes from a
21   simple culture, background, and he's always
22   accepted responsibility. The majority of the
23   psych evals all think that he has expressed
24   sufficient remorse and that his insight -- well, I
25   supposed could be argued could be better. It
26   appears to be sufficient for parole suitability.
27   And in terms of self-help, he has been

45

1    participating in AA since '88 and that is the risk

2    or potential that we are presented with Mr. Vivar

3    and so I would also submit that his self-help has

4    been geared toward that risk and is sufficient as

5    well for suitability.  If he is not found

6    suitable, I submit that he only be given a one-

7    year denial based on his excellent record since

8    he's been incarcerated.  He apparently did quite

9    well before the commitment offense and that this

10   offense is the only evidence of any violence on

11   the part of Mr. Vivar.  Thank you.

12        **PRESIDING COMMISSIONER DALY:**  Okay.

13   Mr. Vivar, this is your opportunity to tell the

14   Panel why you feel you are suitable for parole at

15   this time or you can let it rest with what was

16   just presented by your attorney.

17        **INMATE VIVAR THROUGH INTERPRETER:**  Well, I

18   can't say anything.  I mean it's up to you.

19        **PRESIDING COMMISSIONER DALY:**  Okay.  We're

20   going to recess.  It's 0943.

21                    R E C E S S

22                    --o0o--

23

24

25

26

27

46

1    **CALIFORNIA BOARD OF PRISON TERMS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER HARMON:**  We are back on

4    record.

5    **PRESIDING COMMISSIONER DALY:**  Okay.  We're

6    back on record in the matter of Justino Vivar.

7    The Panel has reviewed all of the information

8    received from the public and relied on the

9    following circumstances in concluding that the

10    prisoner is not suitable for parole and would pose

11    an unreasonable risk of danger to society or a

12    threat to public safety if released from prison.

13    The offense itself was carried out in the most

14    atrocious, cruel, callous manner that could be.

15    And there were two victims, although the prisoner

16    was involved directly with the murder of the first

17    victim and these were both killed in the same

18    incident.  And the offense was carried out with a

19    great amount of dispassion.  And it was also quite

20    calculated in that the prisoner kept the victim

21    occupied in an argument while his brother went

22    into a tent to retrieve a machete to hit him with.

23    The victim was abused, defiled, and mutilated

24    during the offense, and it should be noted that

25    the victim had nine stab wounds to his chest and

26    throat and no less than 25 wounds inflicted by the

27    **JUSTINO VIVAR   C-87891   DECISION PAGE 1    5/12/05**

47

1    machete on the victim's arms, back, and head.  A

2    left ear was severed.  And the blows were hit with

3    such tremendous force that there was massive

4    hemorrhaging due to the external lacerations,

5    introthorasic lacerations, lacerations to the

6    carotid artery, and a stab wound severing the

7    victim's aorta.  The victim, therefore, was

8    mutilated during the offense.  And the offense was

9    carried out in a manner that showed a total and a

10   callous disregard for human suffering.  And the

11   motive for the crime was extremely trivial in

12   relation to the offense and that the victim was

13   very young.  There had been words exchanged.

14   Everybody had been drinking, but the reaction of

15   the inmate and his brother was incomprehensible in

16   relationship to the verbal argument that had taken

17   place.  And so that kind of concludes the

18   Statement of Facts, and this crime occurred on

19   December 31st of 1983.  And several illegal aliens

20   were celebrating the oncoming New Year and they

21   were seated around a campfire.  Everybody had been

22   drinking.  The group broke up into two factions.

23   Insults were hurled back and forth, and a fight

24   broke out and the victim was killed as previously

25   described.  After the victim was killed, the

26   prisoner's brother killed another, a second person

27   **JUSTINO VIVAR   C-87891   DECISION PAGE 2    5/12/05**

1   with a machete, and the records indicate the

2   prisoner watched as his brother killed the second

3   person.  However, the prisoner indicates that he

4   did not watch.  The prisoner has minimal criminal

5   history.  Nothing as a juvenile and purchasing of

6   a stolen bike as an adult, but he was an alcoholic

7   and he drank on weekends, and he does consider

8   himself an alcoholic at the time.  And it was

9   noted that when he was finally arrested for this

10  offense, his alcohol level was .26.  The prisoner

11  has yet to acquire his GED and this Panel does not

12  feel he has sufficiently participated in

13  beneficial self-help or therapy programs.  He has

14  only had one 128 counseling chrono and that was in

15  1987, so he has been disciplinary-free.  The

16  psychiatric psychological report, dated 11/12 of

17  '04, by Doctor Stack, is an adequate report.  And

18  when you look at the previous report that was

19  done, the doctor, and that was Doctor Gamard,

20  G-A-M-A-R-D, indicated that violence potential was

21  estimated to be slightly higher than the average

22  citizen in the community.  So given the fact that

23  he now has a good psych report, it would appear to

24  be a recent gain.  And it was noted that in '94,

25  if the inmate were to be paroled or released, his

26  violence potential in the past is estimated to be

27  **JUSTINO VIVAR   C-87891   DECISION PAGE 3    5/12/05**

49

1   average and it was decreasing. But here again,

2   all of the assessments are based on whether or not

3   the prisoner would not drink. So the parole

4   plans, even though there is not a solid job offer,

5   the inmate does have good family support who is

6   willing to set him up with housing,

7   transportation, food and clothing, and with a job

8   either here in the United States or in Mexico at

9   which point when he does parole. The Panel notes

10   that 3042 Notices indicate an opposition to a

11   finding of parole suitability, specifically from

12   the District Attorney of Orange County (sic) who

13   was present at the hearing today. The prisoner

14   should be commended for the fact that he has been

15   disciplinary-free. And I also want to acknowledge

16   that his very first psychiatric report that was

17   done, and this was in 1987, the doctor at that

18   time said that he should learn English, bring up

19   his grade point average, and learn an appropriate

20   trade. And I do believe the inmate has tried to

21   accomplish all of the directions that have been

22   given to him by the doctors and by his counselors.

23   And he does have -- He's been in ABE One, Two, and

24   Three. He has English as a Second Language. He

25   has a vocational upholstery certificate in '03,

26   vocational paint and decoration in April of '99.

27   **JUSTINO VIVAR   C-87891   DECISION PAGE 4   5/12/05**

50

1    He has been in AA since 1988.  In '90 he had

2    Nonviolent Conflict Resolution, '92 Amer-I-Can.

3    He's had Alternatives to Violence.  He is a good

4    student.  He attends church services.  He does

5    leatherwork.  He has laudatory chronos for

6    Christmas Toy drives from the Women's Crisis

7    Center and from Hobby Department Donations.

8    However, these positive aspects of his behavior do

9    not outweigh the factors of unsuitability.  In a

10   separate decision, the Hearing Panel finds it is

11   not reasonable to expect that parole would be

12   granted at a hearing during the following two

13   years.  The prisoner committed the offense in a

14   very cruel manner.  Specifically, he and his

15   brother were celebrating an oncoming New Year with

16   several other illegal aliens.  There was a lot of

17   drinking going on.  There were insults being

18   hurled back and forth.  The group split up and a

19   fight broke out.  The prisoner and his brother

20   attacked the victim with a machete and with a

21   knife, stabbing him multiple times and hitting him

22   with a machete at least 25 times causing an ear to

23   be severed and very, very much trauma to the

24   victim's body and as a result, he died.  And then

25   the brother pursued a second victim and killed him

26   with the machete while the victim -- while the

27   **JUSTINO VIVAR  C-87891  DECISION PAGE 5    5/12/05**

51

1   brother -- while the prisoner, Mr. Vivar, was

2   present.  The offense was carried out in a very

3   dispassionate and calculated manner, and the

4   victim was abused, defiled, and mutilated during

5   the offense.  And the offense was carried out in a

6   manner that showed a total disregard for the human

7   suffering.  And the motive for the crime was

8   extremely trivial in relation to the offense in

9   that this victim died a horrific death and a

10  second one died a senseless, horrific death all

11  over spoken words.  The recent psychiatric

12  psychological report, dated 11/12 of '04, authored

13  by Doctor Stack, is supportive, but they're also

14  just recent gains from the '02 report.  The

15  prisoner still needs to complete his GED and the

16  Panel feels that he still needs to participate in

17  more self-help.  Therefore, a longer period of

18  observation and evaluation of the prisoner is

19  required before the Board should find the prisoner

20  is suitable for parole.  And the Panel recommends

21  that the prisoner remain disciplinary-free, and if

22  available continue with whatever vocational

23  training he can, upgrade educationally, and

24  participate in self-help.  And with that, I wish

25  you luck, Mr. Vivar.  Counsel, or Mr. Harmon, do

26  you have any comments?

27  **JUSTINO VIVAR  C-87891  DECISION PAGE 6   5/12/05**

52

1        **DEPUTY COMMISSIONER HARMON:**  Nothing further.

2   I wish you luck, sir.

3        **PRESIDING COMMISSIONER DALY:**  Okay.  It is

4   10:05.

5        **DEPUTY DISTRICT ATTORNEY SACHS:**  Thank you.

6        **PRESIDING COMMISSIONER DALY:**  Thank you.

7                        --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED TWO YEARS**

24   **THIS DECISION WILL BE FINAL ON Sep. 9, 2005**

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **JUSTINO VIVAR  C-87891  DECISION PAGE 7   5/12/05**

53

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TAMYRA MORGAN, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 through 52, and which recording was
duly recorded at CORRECTIONAL TRAINING FACILITY,
at SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of JUSTINO
VIVAR, CDC No. C-87891, on MAY 12, 2005, and that
the foregoing pages constitute a true, complete,
and accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated May 26, 2005, at Sacramento County,
California.

Tamyra Morgan
Transcriber
**CAPITOL ELECTRONIC REPORTING**